**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SOPHIA HARTLEY, individually and on behalf of all others similarly situated | |
| Plaintiff, | Case No. 1:22-cv-05891 |
| v. | |
| UNIVERSITY OF CHICAGO MEDICAL CENTER and META PLATFORMS, INC., | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff Sophia Hartley ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, brings this Class Action Complaint against Defendants University of Chicago Medical Center ("UChicago") and Meta Platforms, Inc. ("Facebook") for (1) violation of § 2511 of the Electronic Communications Privacy Act ("ECPA"); (2) violation of § 2701 of the Stored Communications Act ("SCA"); (3) Breach of Contract; (4) Breach of Implied Duty of Confidentiality; and (5) Invasion of Privacy – Intrusion Upon Seclusion. Plaintiff's claims arise from UChicago's practice of knowingly disclosing the personally identifiable, sensitive and confidential HIPAA-protected patient health information (PHI) of its patients to Facebook without their knowledge or consent. Plaintiff's allegations are made on personal knowledge as to her own acts and upon information and belief as to all other matters.

**NATURE OF THE ACTION**

1.     This is a medical privacy action against UChicago and Facebook, for violating the ECPA, violating the SCA, and violating other common law privacy rights by knowingly and repeatedly disclosing the identities and sensitive medical data of its patients to Facebook without their knowledge, authorization, or consent.

1

2.     Healthcare providers such as UChicago have a strict fiduciary duty to keep patient data, communications, diagnoses, treatment information, and other PHI completely confidential unless authorized to make disclosures by the patient.

3.     The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the United States Department of Health and Services' ("HHS") implementing regulations establish a national standard to protect patient health care information, medical records, and other individually identifiable information.

4.     This national standard is codified under 45 C.F.R. § 160 and Subparts A and E of Part 164 where a healthcare provider may not disclose personally identifiable patient information, PHI, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization. This information includes a "subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual." *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. § 160.103; 45 C.F.R. §§ 164.501; 164.508(a), 164.514(b)(2)(i).

5.     HHS provides guidance for healthcare providers that patient status alone is protected by HIPAA.

6.     In Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with HIPAA, HHS states:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such

information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data … If such information was listed with health condition, health care provision or payment data, *such as an indication that the individual was treated at a certain clinic*, then this information would be PHI. [1]

7.    In its guidance for Marketing, HHS further states:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing … Simply put, a covered entity may not sell protected health information to a business, associate, or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.*[2]

8.    Accordingly, patients of UChicago have a reasonable expectation of privacy that the content of their communications with UChicago, including personally identifiable information and PHI, will not be intercepted, transmitted, re-directed, or disclosed by UChicago to third parties without the patient's knowledge, authorization, or consent.

9.    Notwithstanding its fiduciary duty, UChicago systematically violated the medical privacy rights of its patients by causing the contemporaneous unauthorized interception and transmission of personally identifiable patient information and PHI, and re-direction and disclosure of the precise content of patient medical communications with UChicago to at least one third party (Facebook) without patient knowledge, authorization, or consent.

10.    Like many other hospitals and healthcare providers, UChicago encourages patients to use a number of supposedly "secure" patient portals to communicate with UChicago, including,

---

[1]   *See* https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (November 26, 2012).

[2]*See* https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (April 3, 2003).

but not limited to, to communicate with doctors, request prescription refills, access test results, view their account details, schedule appointments, make payments, and access their doctor's notes.

11. Whenever a patient uses UChicago web properties, including its MyChart portal and my.WellnessPortal, UChicago intercepts, contemporaneously causes transmission of, and uses personally identifiable patient information and PHI without its patients' knowledge, consent, or authorization.

12. UChicago surreptitiously discloses the personally identifiable patient information and PHI of Plaintiff and Class members, including their status as patients and the contents of their communications with UChicago to Facebook.

13. UChicago collects and shares the personally identifiable information and PHI of patients using a "Facebook Pixel." A Facebook Pixel is a snippet of programming code that, once installed on a webpage or mobile application, tracks users – unbeknownst to them – as they navigate through a website or app and transmits information regarding the user's activity to Facebook.

14. In this case, the information shared with Facebook includes the patient's IP address, anytime a patient clicks a tab on MyChart or the my.WellnessPortal for any action (*e.g.*, schedule an appointment, view test results), cookie values, and even the patients' Facebook ID ("FID"). A user's FID is linked to the patient's Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interest, work history, relationship status, and other personal details.

15. Importantly, UChicago discloses its patients' FID, personally identifiable patient information, and PHI to Facebook together in a single transmission. This occurs even though patients have not shared (nor consented to share) such information. Because the subscriber's FID

uniquely identifies an individual's Facebook user account, Facebook – or any other ordinary person – can use it to quickly and easily locate, access, and view the subscriber's Facebook profile. In other words, the Facebook Pixel allows Facebook to know not only an individual's status as a patient of UChicago, but the sensitive medical data its patients have exchanged on UChicago's MyChart and my.WellnessPortal patient portals. Facebook then monetizes this information to generate highly-lucrative targeted advertising on its various platforms.

16.     As a consequence of UChicago's conduct in disclosing personally identifiable patient information and PHI and re-directing and disclosing the content of patient communications to Facebook without patient knowledge, consent, or authorization, UChicago has violated the ECPA; breached and betrayed the confidential nature of the healthcare provider-patient relationship; and removed the private nature of sensitive and confidential information that Plaintiff and Class members intended to remain private. Facebook, moreover, has violated the SCA and breached its own contractual promises made to its users.

17.     UChicago disregarded the statutorily protected privacy rights of Plaintiff and thousands of other patients by releasing their sensitive data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to UChicago's practice of intercepting and disclosing the personally identifiable patient information and other PHI of its patients to Facebook.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*. and 18 U.S.C. § 2701 *et seq*.

19.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of either Defendant.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in and are subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

## THE PARTIES

21.     Plaintiff Sophia Hartley is a natural person and a citizen of the State of Wisconsin. Plaintiff has been a patient of UChicago since at least 2019. Plaintiff has also been a MyChart patient portal user and a my.WellnessPortal user since at least 2019. During the relevant time period, Plaintiff has visited both UChicago web properties to schedule appointments, view test results, access her doctor's notes, message doctors and nurses, review medications, and make payments for medical services. By doing so, Plaintiff's personally identifiable patient information and PHI was disclosed to Facebook under the systematic process described herein. Plaintiff had no knowledge her sensitive medical information was shared with Facebook or other third parties and gave no consent or authorization for UChicago to disclose her personally identifiable patient information and PHI.

22.     Defendant UChicago is an Illinois not-for-profit corporation headquartered in Chicago, Illinois. UChicago encourages patients, which number in the thousands, to use and communicate with medical providers through the UChicago MyChart patient portal and the my.WellnessPortal student patient portal. The Pritzker School of Medicine, Biological Sciences

Division, Medical Center, Community Health and Hospital Division, and UChicago Medicine Physicians are all a part of UChicago.

23. Defendant Facebook, is a Delaware corporation and multinational technology conglomerate with its principal place of business in Menlo Park, California.

## FACTUAL BACKGROUND

**I. University of Chicago Medical Center's Patient Portals**

24. UChicago maintains various web properties, including www.mychart.uchospitals.edu and www.wellness.uchicago.edu ("Patient Portals") for its patients to communicate with UChicago, including but not limited to exchanging communications about bill payment, doctors, services, treatments, conditions, and appointments.

25. Plaintiff exchanged communications with UChicago Patient Portals, identifying herself to UChicago as a patient, and exchanged communications relating to her particular providers and medical conditions.

26. UChicago's patient portal, www.mychart.uchospitals.edu/mychart or "MyChart" allows its patients to communicate with UChicago with options including but not limited to "communicate with your doctor," "access your test results," and "schedule an appointment."[3]

27. UChicago states that its MyChart portal "provides secure online access to portions of your medical records from the University of Chicago Medical Center," and that "[UChicago] is committed to protecting the confidentiality of your medical information."[4]

28. UChicago also offers comprehensive medical care to its university students, like Plaintiff, through the UChicago Student Wellness Center. Defendant's Student Wellness Center

---

[3] *See* https://mychart.uchospitals.edu/mychart/Authentication/Login?
[4] *See,*
https://mychart.uchospitals.edu/MyChart/Authentication/Login?mode=stdfile&option=termsandconditions

provides students with a separate portal for its student patients, wellness.uchicago.edu or "my.WellnessPortal" which allows its student patients to communicate with UChicago with options including but not limited to scheduling appointments, messaging health care professionals, and viewing lab results.[5]

29.     UChicago states that its Student Wellness Center "uses [its patients'] health information only to provide [its patients] with medical care and counseling services, to support our own operations, and as otherwise permitted by applicable state and federal law," and that it "will not disclose [its patients'] health information for purposes other than your treatment without your prior written consent."[6]

30.

In the face of these promises, UChicago deployed Facebook's Meta Pixel and other third-party web beacons and tracking pixels on its Patient Portals that cause the contemporaneous unauthorized transmission of personally identifiable patient information and PHI and the precise content of patient communications with UChicago to Facebook whenever a patient uses UChicago's patient portals.

## II.  Facebook's Contractual Promises

31.     Anytime a persons a Facebook account, they legally agree to its Terms, Data Policy, and Cookie Policy via a checkbox on the sign-up page; and the Terms, Data Policy, and Cookie Policy are binding upon Facebook and its users.

---

[5] *See*      https://wellness.uchicago.edu/about/your-health-records-at-your-fingertips-information-on-your-medical-records-and-online-portal-at-uchicago-student-wellness/

[6] Notice of Privacy Policies, *available at* https://wellness.uchicago.edu/about/notices/

32.     The Facebook Data Policy expressly states that Facebook "requires" businesses that use the Facebook Pixel "to have lawful rights to collect, use, and share your data before providing any data to [Facebook]."[7]

33.     However, Facebook does not actually verify that these businesses that use the Facebook Pixel have obtained the requisite consent per the contract.

34.     Instead, Facebook applies an "honor system" where businesses "represent[s] and warrant[s] that [they have] provided robust and sufficient prominent notice to users regarding the Business Tool Data collection, sharing, and usage."[8]

35.     As a result, the Facebook Pixel is made available to any willing business or publisher regardless of the nature of their business.

36.     Facebook's contracts with healthcare providers such as UChicago for use of the Facebook Pixel make no mention of HIPAA.

## III.  Types of Personally Identifiable Patient Information and PHI That UChicago Causes to Be Transmitted to Facebook

37.     The types of personally identifiable patient information and PHI that UChicago causes to be intercepted and transmitted to Facebook whenever a patient uses UChicago's web properties include, but is not limited to:

a.  Patient IP addresses;

b.  Unique, persistent patient cookie identifiers;

c.  Device identifiers;

d.  Account numbers;

---

[7] *See* https://www.facebook.com/privacy/policy/version/20220104/
[8] *See* https://www.facebook.com/legal/terms/businesstools

e. URLs;

f. Patient FID; and

g. Every communication a patient sends on MyChart.

## IV. How UChicago Intercepts and Discloses Patients' Personally Identifiable Information and PHI

### 1. Tracking Pixels

38. The Facebook tracking Pixel, also known as a "tag" or "web beacon" among other names, is an invisible tool that tracks consumers' actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the Pixel, the website owner tells Facebook which website events it wants to track (*e.g.*, scheduling an appointment or messaging a doctor) and Facebook returns corresponding Facebook Pixel code for the advertiser to incorporate into its website.

39. Facebook benefits from websites like UChicago installing its Pixel. When the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook or other Meta-owned platforms, like Instagram. In addition, even if the business does not advertise with Facebook, the Pixel assists Facebook in building more fulsome profiles of its own users, which in turn allows Facebook to profit from providing more (and more lucrative) targeted ads. The Pixel is installed on websites all over the internet and, accordingly, provides Facebook with information about its users' preferences, other distinguishing traits, and web-browsing activities outside of Meta-owned platforms.

40. UChicago installed the Facebook Pixel, which enables it to disclose Plaintiff's and Class Members' personally identifiable patient information and PHI to Facebook, because it benefits financially from the targeted advertising and information services that stem from use of the Pixel. When a UChicago patient uses a Patient Portal and schedules an appointment, views test

results, views their doctor's notes, or conducts any action, the website or App sends certain information about the patient to Facebook, including, but not limited to, their identity and the specific actions they took and health procedures they underwent. As such, UChicago sends Facebook sensitive and personally identifiable patient information, PHI, patient IP addresses, its URL, and, most notably, the patients' Facebook ID.

### 2. Facebook ID ("FID")

41.     An FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. When a Facebook user with one or more personally identifiable FID cookies on their browser uses UChicago's Patient Portals, UChicago, through its website code, causes the patient's identity and personally identifiable patient information to be transmitted to Facebook by the user's browser. This transmission is not the patient's decision, but results from UChicago's purposeful use of its Facebook Pixel by incorporation of that Pixel and code into UChicago's Patient Portals. UChicago could easily program its Patient Portals so that this information is not automatically transmitted to Facebook when a patient logs in and uses the portal. However, it is not in UChicago's financial interest to do so because it benefits financially by providing this highly sought-after information.

42.     Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of a FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and other personally identifiable patient information and PHI – all of which UChicago knowingly, readily, and repeatedly provides to Facebook without any consent from the patients – any ordinary person

11

could learn the identity of the patient, the types of medical procedures the patient underwent, or even the patient's doctor's notes from UChicago.

43.     At all relevant times, UChicago knew that the Facebook Pixel disclosed personally identifiable patient information and PHI to Facebook. This was evidenced from, among other things, the functionality of the Pixel, including that it enabled UChicago's Patient Portals to show targeted advertising to its digital subscribers based on the products those digital subscribers had previously viewed on the website, including certain medical tests or procedures, for which UChicago received financial remuneration.

**V.     UChicago Unlawfully Discloses Its Patients' Personally Identifiable Patient Information and PHI to Facebook.**

44.     UChicago maintains a vast digital database comprised of its patients' personally identifiable patient information and PHI, including their names, addresses, social security numbers, phone numbers, medical history, prescriptions, and other sensitive medical information.

45.     UChicago is not sharing anonymized, non-personally identifiable data with Facebook. To the contrary, the data it discloses is tied to unique identifiers that track specific Facebook users. Importantly, the recipient of the personally identifiable patient information and PHI – Facebook – receives the personally identifiable and PHI as one data point. UChicago has thus monetized its database by disclosing its patients' personally identifiable patient information and PHI to Facebook in a manner which allows it to make a direct connection – without the consent of its patients and to the detriment of their legally protected privacy and medical rights.

46.     Critically, the personally identifiable patient information and PHI UChicago discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in itsown detailed profiles for its own users, adding to its trove of personally identifiable data.

12

47.     As a result of UChicago's data compiling and sharing practices, UChicago has knowingly disclosed to Facebook for its own personal profit the personally identifiable patient information and PHI of its patients.

48.     UChicago does not seek its patients' prior written consent to the disclosure of their personally identifiable patient information and PHI (in writing or otherwise) and its patients remain unaware that their PHI and other sensitive data is being disclosed to Facebook.

49.     By disclosing its patients' personally identifiable patient information and PHI to Facebook – which undeniably reveals their identity and other sensitive medical data – UChicago has intentionally and knowingly violated the ECPA.

## VI.     Plaintiff's Experience

50.     Plaintiff Sophia Hartley has been a patient of UChicago since at least 2019. Plaintiff has also been a MyChart patient portal user and a my.WellnessPortal user since at least 2019.

51.     When Plaintiff became a patient of UChicago and used any of the Patient Portals, she provided her name, email address, date of birth, and any cookies associated.

52.     Plaintiff has had a Facebook account since before becoming a patient of UChicago through the present. From at least 2019 to the present, Plaintiff has used UChicago web properties to schedule appointments, view test results, access her doctor's notes, message doctors and nurses, review medications, and make payments for medical services.

53.     Plaintiff never consented, agreed, authorized, or otherwise permitted UChicago to disclose her personally identifiable patient information and PHI to Facebook. Plaintiff has never been provided written notice that UChicago discloses its personally identifiable patient information and PHI, or any means of opting out of such disclosures of her personally identifiable

13

patient information and PHI. UChicago nonetheless knowingly disclosed Plaintiff's personally identifiable patient information and PHI to Facebook.

54.     Because Plaintiff is entitled by law to privacy in her electronic communications with UChicago through the UChicago Patient Portals, the intentional disclosure of the contents of her communication to Facebook deprived Plaintiff of the full set of benefits to which she is entitled.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States who are, or were patients of University of Chicago Medical Center or any of its affiliates and accessed a Patient Portal that caused a transmission of personally identifiable patient information, PHI, and other electronic communications to be made to Facebook.

56.     Excluded from the Class are the University of Chicago Medical Center, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined by 28 USC § 455(b) and their immediate families.

57.     This action is properly maintained as a class action under Federal Rules of Civil Procedure 23(a) because:

A.      The class is so numerous that joinder of all members is impracticable;

B.      There are questions of law or fact that are common to the class;

C.      The claims of the Plaintiff are typical of the claims of the class; and,

D.      The Plaintiff will fairly and adequately protect the interests of the class.

## Numerosity

14

58.     Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are thousands of members of the Class. Class members can be identified from UChicago's records and Facebook's records.

## Typicality

59.     There is a well-defined commonality of interest in the substantial questions of law and fact concerning and affecting the Class in that Plaintiff and all members of the Class have been harmed by UChicago's and Facebook's failure to comply with the ECPA and violations other common law privacy and contractual rights. The common questions of law and fact include, but are not limited to the following:

A.     Whether UChicago had a duty to protect and refrain from disclosing Plaintiff's and Class members' personally identifiable patient information and PHI;

B.     Whether UChicago knowingly disclosed Plaintiff's and Class members' personally identifiable patient information and PHI to Facebook;

C.     Whether Plaintiff and Class members authorized or consented to UChicago's disclosure of their personally identifiable patient information and PHI to Facebook

D.     Whether the information disclosed to Facebook concerning Plaintiff's and Class members' personally identifiable patient information and PHI constitutes unlawful interception of electronic communication under the ECPA;

E.     Whether UChicago's disclosure of Plaintiff's and Class members' personally identifiable patient information and PHI to Facebook was intentional under the ECPA;

F.     Whether the Facebook's Terms, Data Policy, and Cookie Policy are valid contracts and whether Facebook breached those contracts;

G.     Whether Plaintiff and Class Members are entitled to damages as a result of Defendants' conduct.

60.    Plaintiff anticipates that UChicago and Facebook will raise defenses that are common to the class.

### Adequacy

61.    Plaintiff will fairly and adequately protect the interests of all members of the class, and there are no known conflicts of interest between Plaintiff and the class members. Plaintiff, moreover, has retained experienced counsel that are competent in the prosecution of complex litigation and who have extensive experience acting as class counsel.

### Typicality

62.    Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by UChicago and Facebook that caused personally identifiable patient information and PHI to be disclosed to Facebook without obtaining express written consent. Her claims are based on the same legal theories as the claims of other Class members.

### Predominance and Superiority

63.    The common questions identified above predominate over any individual issues, which will relate solely to the quantum of relief due to individual class members. A class action is superior to other available means for the fair and efficient adjudication of this controversy because individual joinder of the parties is impracticable. Class action treatment will allow a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense if these claims were brought individually. Moreover, as the damages suffered by each class member are relatively small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it difficult for individual class members to vindicate their claims.

64.     Additionally, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially more than if claims are treated as a class action. Prosecution of separate actions by individual class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for UChicago and Facebook and/or substantially impair or impede the ability of class members to protect their interests. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

## FIRST CAUSE OF ACTION

**Violation of the Electronic Communications Act ("ECPA")18 U.S.C. § 2510 *et seq*
UChicago Defendant**

65.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

66.     A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any … electronic communication" or "intentionally discloses, or endeavors to disclose, to any person the contents of any … electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] … electronic communication" or "intentionally uses, or endeavors to use, the contents of any … electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] … electronic communication." 18 U.S.C. §§2511 (1)(a), (c) – (d).

67.     In addition, "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication [ ] while in transmission on that service to any person or entity other than an addressee or intended recipient

of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511 (3)(a).

68.    As defined in 18 U.S.C. § 2510 (12), "electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce."

69.    As defined in 18 U.S.C § 2510(4), "intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."

70.    As defined in 18 U.S.C § 2510(8), "contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue.

71.    As defined in 18 U.S.C § 2510(15), an "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications.

72.    18 U.S.C. §2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

73.    Plaintiff and the Class members' use of UChicago's Patient Portals are electronic communications under the ECPA.

74.    UChicago's Patient Portals are an electronic communication service under the ECPA.

75.    Whenever Plaintiff and Class members interacted with UChicago's Patient Portals, through the Facebook Pixel it deployed and ran on its website, UChicago and Facebook

contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiff's and Class members' electronic communications without authorization or consent.

76.     Whenever Plaintiff and Class members interacted with UChicago's Patient Portals, through the Facebook Pixel it deployed and ran on its website, UChicago contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's' and Class members' electronic communications to Facebook without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

77.     Whenever Plaintiff and Class members interacted with UChicago's Patient Portals, through the Facebook Pixel it deployed and ran on its website, UChicago and Facebook contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class members' electronic communications, for purposes other than providing health care services to Plaintiff and Class members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

78.     Whenever Plaintiff and Class members interacted with UChicago's Patient Portals, through the Facebook Pixel it deployed and ran on its website, UChicago and Facebook contemporaneously and intentionally redirected the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook.

79.     Whenever Plaintiff and Class members interacted with UChicago's Patient Portals, through the Facebook Pixel it deployed and ran on its website, UChicago contemporaneously and intentionally divulged the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook.

80.     UChicago and Facebook intentionally intercepted and used the contents of Plaintiff's and Class members' electronic communications for the unauthorized purpose of disclosing and, profiting from, Plaintiff's and Class members' communications.

81.     Plaintiff and Class members did not authorize UChicago to acquire the content of their communications for purposes of sharing and selling the personally identifiable information and PHI contained therein.

82.     Plaintiff, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Violation of the Stored Communications Act 18 U.S.C. § 2701
### Facebook Defendant

83.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

84.     A violation occurs when anyone "intentionally accesses without authorization a facility through which an electronic communication service is provided." 18 U.S.C. § 2701(a).

85.     18 U.S.C. § 2707(a) provides a private right of action to anyone "aggrieved by any violation" engaged in with a "knowing or intentional state of mind."

86.     UChicago's Patient Portals are a "facility" as defined by the SCA as the portals store both the medical information of their users and the communications between UChicago and the Plaintiff and Class members.

87.     UChicago allowed Facebook to access the personally identifiable patient information and PHI from its Patient Portals through the deployment of the Facebook Pixel.

88.     Plaintiff and Class members did not have knowledge of, authorize, or consent to Facebook's accessibility to Plaintiff's and Class members' personally identifiable patient information and PHI stored in UChicago's Patient Portals.

89.     Facebook's access of Plaintiff's and Class members' personally identifiable patient information and PHI constitutes "unauthorized access" within the meaning of 18 U.S.C § 2701(a) because Plaintiff and Class members had no reasonable expectation their personally identifiable patient information and PHI would be shared with an unknown third party.

90.     Facebook intentionally exceeded its authorization to access the Plaintiff's and Class members' personally identifiable patient information and other PHI through UChicago's Patient Portals in violation of 18 U.S.C. § 2701(a)(2).

## THIRD CAUSE OF ACTION

### Breach of Contract
### Facebook Defendant

91.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

92.     Facebook requires users to click a box indicating that, "By clicking Sign Up, you agree to our Terms, Data Policy and Cookies Policy."

93.     "Click-wrap agreements" such as the one used by Facebook are valid and binding contracts.

94.     The Facebook Terms, Facebook Data Policy, and Facebook Cookie Policy are binding on Facebook and its users.

95.     The Facebook Data Policy promises users that Facebook "requires each of [Facebook's] partners to have lawful rights to collect, use and share your data before providing any data to [Facebook]."

96.     Facebook breached this contractual promise, by not requiring its partners that are healthcare providers, including UChicago, to obtain patient consent before sharing patient status, patient portal communications, and other personally identifiable patient information and PHI with Facebook through the Facebook Pixel.

97.     Plaintiff and Class members are Facebook account holders who used UChicago's patient portals through which Facebook unlawfully obtained their personally identifiable patient information and other PHI.

98.     The personally identifiable patient information and other PHI that Facebook obtained in breach of the contract include:

    a.   Patient IP addresses;

    b.   Cookie identifiers;

    c.   Device identifiers;

    d.   Account numbers; and

e.      Every electronic communication the patient has with the patient portals including appointment scheduling, whether the patient viewed test results, patient communications with their doctors, and patient medical conditions.

**FOURTH CAUSE OF ACTION**

**Breach of Implied Duty of Confidentiality**
**UChicago Defendant**

99.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

100.    Plaintiff and Class members were patients of the UChicago and received healthcare services from UChicago.

22

101.    UChicago agreed to keep Plaintiff's and Class members' information confidential as part of establishing and maintaining the healthcare services provider/patient relationship between UChicago and the Plaintiff and Class members.

102.    There is a duty of confidentiality implied in every healthcare provider and patient relationship, akin to an implied contract, such that healthcare services providers may not disclose confidential information acquired through the healthcare provider-patient relationship. *See e.g., Geisberger v. Willuhn*, 72 Ill. App. 3d 435, 438 (2d Dist. 1979).

103.    The implied duty of confidentiality is at least as extensive as UChicago's statutory obligations as a healthcare services provider to maintain patient confidentiality.

104.    Under the Illinois' Medical Patient Rights Act ("MPRA") "health care provider[s]" must "refrain from disclosing the nature or details of services provided to patients." 410 ILCS § 50/3.

105.    Under 735 ILCS 5/8-802, "[n]o physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character."

106.    UChicago may also not disclose personally identifiable information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

107.    Plaintiff and Class members performed all required conditions of their implied contracts with UChicago.

108.    UChicago breached the implied duty of confidentiality to Plaintiff and Class members by intentionally deploying tracking pixels and web beacons at its Patient Portals that

23

caused the transmission of personally identifiable patient information, PHI, and communications to third parties including Facebook.

109.    Plaintiff seeks all monetary and non-monetary relief allowed by law.

## FIFTH CAUSE OF ACTION

### Invasion of Privacy - Intrusion Upon Seclusion
### UChicago Defendant

110.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

111.    Plaintiff's and Class members' communications with UChicago constitute private conversations, communications, and information.

112.    Plaintiff and Class members have a reasonable expectation that UChicago would not disclose personally identifiable patient information, PHI, and communications to third parties for marketing purposes without Plaintiff's or the Class members' authorization, consent, or knowledge.

113.    As a healthcare provider, UChicago has a duty to keep personally identifiable patient information, PHI, and communications confidential.

114.    UChicago expressly promised to maintain the confidentiality of personally identifiable patient information, PHI, and communications in its HIPAA Notice of Privacy Practices.[9]

115.    UChicago intruded upon Plaintiff's and Class members' seclusion by deploying tracking pixels and web beacons that caused the transmission of Plaintiff's and Class members' personally identifiable patient information, PHI, and the contents of communication Plaintiff and Class members exchanged with their healthcare providers to third parties including Facebook.

---

[9] *See* https://www.uchicagomedicine.org/about-us/privacy-practices

116. Plaintiff and Class members did not authorize, consent, know about, or take any action to indicate consent to UChicago's conduct alleged herein.

117. Plaintiff and Class members' personally identifiable patient information, PHI, and communications are the type of sensitive, personal information that one normally expects will be protected from disclosure to unauthorized parties by the very entity charged with protecting it. Further, the public has no legitimate concern in Plaintiff's and Class members' personally identifiable patient information, PHI, and communications, and such information is otherwise protected from exposure to the public by various statutes, regulations, and other laws.

118. UChicago's conduct described herein was intentional and highly offensive to a reasonable person.

119. UChicago's willful and reckless conduct in allowing access to and disclosure of Plaintiff's and Class members' sensitive, personally identifiable patient information, PHI, and communications to unauthorized third parties is such that it would cause serious mental injury, shame or humiliation to people of ordinary sensibilities.

120. Due to the invasion of privacy caused by UChicago, Plaintiff and Class members suffered and will continue to suffer damages and injury as set forth herein.

121. Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, restitution injunctive relief, reasonable attorneys' fees and costs, and any other relief that is just and proper.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Sophia Hartley respectfully requests that this Court enter and Order:

A.      Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Sophia Hartley as Class Representative, and appointing Stephan Zouras, LLP as Class Counsel;

B.    Declaring that University of Chicago Medical Center's actions, as set forth above, violate the ECPA, 18 U.S.C. § 2511 (1)(a), (c)-(d);

C.    Awarding statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000 to Plaintiff and each Class member, as provided by the ECPA, 18 U.S.C. § 2520(c)(2);

D.    Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E.    Awarding Plaintiff and the Class their reasonable attorneys' fees and other litigation expenses, 18 U.S.C. § 2520(b)(3);

F.    Declaring that Facebook's actions, as set forth above, violate the SCA, 18 U.S.C § 2701(a) and constitute a breach of contract;

G.    Awarding statutory damages of the sum of the actual damages suffered by the Plaintiff and Class members and any profits made by Facebook as a result of the violation, no less than $1,000, 18 U.S.C. § 2707(c).

H.    Awarding injunctive and other equitable relief as is necessary to protect the interests of the Plaintiff and the Class;

I.    Awarding Plaintiff and the Class their reasonable attorneys' fees and other litigation expenses, 18 U.S.C § 2707 (b)(3);

J.    Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

K.    Awarding such other and further relief as equity and justice may require.


Date:    October 25, 2022                    Respectfully Submitted,

                                             */s/ Mohammed    A.    Rathur*
                                             Ryan F. Stephan
                                             James B. Zouras
                                             Mohammed A. Rathur
                                             **STEPHAN ZOURAS, LLP**
                                             100 N. Riverside Plaza, Suite 2150
                                             Chicago, Illinois 60606
                                             312.233.1550
                                             312.233.1560 *f*
                                             rstephan@stephanzouras.com
                                             jzouras@stephanzouras.com
                                             mrathur@stephanzouras.com

26

Firm ID: 43734

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I, the attorney, hereby certify that on October 25, 2022, I filed the attached with the Clerk of the Court using the ECF system which will send such filing to all attorneys of record.

<u>*/s/ Mohammed A. Rathur*</u>